**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANGEL LUIS SANTOS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | **CIVIL ACTION** |
| | : | |
| | : | **NO. 09-3437** |
| **JOHN DELANEY,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |

**MEMORANDUM OPINION**

**Tucker, C. J.**                                                         **January 17, 2014**

Presently before the Court is Defendant's Motion for Summary Judgment (Doc. 78),

Plaintiff's Response in Opposition (Doc. 83), Defendant's Reply in Support (Doc. 88), and

Plaintiff's Sur-Reply (Doc. 91).  Upon consideration of the parties' motions with briefs and

exhibits, and for the reasons set forth below, Defendant's Motion will be denied.

## I.        FACTUAL BACKGROUND[1]

From June 2007 to September 2007, Angel Luis Santos ("Plaintiff" or "Santos") was a

pretrial detainee at the Philadelphia Detention Center ("PDC"). During this time, John Delaney

("Defendant" or "Delaney") was the Warden at PDC.  On July 13, 2007, Santos was climbing

into the top-level bunk in his cell when he slipped and fell. Santos alleges that during this fall, he

became stuck and hung upside down for a substantial period of time, causing injury to his right

---

[1] Although the Court's scheduling order requires parties to submit a Statement of Stipulated Material Facts, no
Statement of Stipulated Material Facts was submitted.  Delaney argues the parties were unable to agree on a set of
stipulated facts, while Santos argues Delaney never attempted to discuss or agree on a set of stipulated facts.  The
facts described herein are undisputed unless otherwise noted.  When in dispute, all reasonable inferences will be
drawn in Santos' favor as the non-moving party.

leg. (Santos Decl.  ¶¶ 12-13.) Following this injury, Santos was taken to Frankford Hospital, examined, and returned to the PDC. (Id. ¶¶ 14-15.)

### A.  Inadequate Medical Care

The parties agree on little beyond these few basic facts.  Santos alleges that, upon his return to the PDC, his leg was swollen and painful, which was exacerbated by his again being placed in a cell with a top-level bunk. (Id. ¶¶ 15-16.)  Santos subsequently submitted a number of grievances, complaints, and sick call requests to Delaney's staff asking for treatment of his injury. (Santos Decl. ¶ 17; id. at Exs. A-C, E-G, L-M, Q-U, W-Z.)  Nonetheless, Santos avows all he received for two weeks was ice, which did not alleviate his swelling and pain. (Id. ¶ 17.) Santos maintains it was his understanding that this lack of treatment was caused by the failure of PDC staff to obtain records from Frankford Hospital in a timely fashion. (Id. ¶ 18.)

The parties agree that Santos was ultimately taken to Frankford Hospital again.[2]  This time, Santos was prescribed medication, given crutches and a leg immobilizer, and returned to the PDC. (Id. ¶ 19.)  Santos alleges that he continued to be in pain, and a member of the PDC's medical staff prescribed him a sock or leg wrap in order to improve blood flow and reduce swelling.  However, Santos asserts that no one ever provided him with a sock or leg wrap, despite his repeated requests. (Id. ¶ 20; id. at Exs. C, T, U.) Additionally, notwithstanding Santos' requests, no other medical staff or specialists were called in to examine his leg. (Id. ¶ 21.) Santos claims he continues to feel pain and swelling in his leg to this day. (Id. ¶ 22.)  Delaney denies these allegations.

The parties agree that subsequently, from August 2 to August 8, 2007, Santos was on a hunger strike.  Santos contends his hunger strike was to protest the conditions of his confinement including, but not limited to, the alleged lack of adequate medical treatment cited above. (Id. ¶

---

[2] It is unclear from the record when this second visit to Frankford Hospital took place.

23.)  The parties further agree that Santos was subsequently returned from PDC's medical unit to a cell on B-Block, Cell 209 ("Cell B-209").

### B.  Incarceration in a Cell without Ventilation

The parties disagree on what transpired next.  Santos avers that Cell B-209 was extremely hot upon his return, as the temperature that day either approached or exceeded 90 degrees Fahrenheit. (Id. ¶¶ 25-26.)  Santos asserts he attempted to open the window (the only source of ventilation in the cell), only to learn that the window was inoperable. (Id. ¶ 27.) Santos claims he brought the condition of the window to the attention of the guard who brought him to the cell, but the guard did not respond or attempt to remedy the issue. (Id. ¶ 28.)  Santos further alleges that, for the remainder of the day, he attempted to inform any guard who passed within earshot that his cell was extremely hot and that the heat was causing him physical distress, but no one responded. (Id. ¶ 29.) Santos maintains that his distress was so obvious that other inmates in cells located near him also requested that the guards intervene to assist him.  Allegedly, none did. (Id. ¶ 30.) Santos avers he was so sickened by the heat that he needed to lay on the floor of his cell to ward off nausea and dizziness. (Id. ¶ 31.) Santos claims he was left to lie in a puddle of water on the floor of his cell for the entire night of August 8, 2010 and most the next day. (Id. ¶ 32.) Delaney denies all of these allegations.  The parties agree that Santos was eventually removed from Cell B-209 around 5 pm on August 9, 2007.  The parties also agree that Santos was returned to Cell B-209 on August 17, 2007.  During the interim, the window in Cell B-209 had been repaired. (Id. ¶ 34.)

### C.  Excessive Use of Force and Destruction of Property by PDC Staff

However, Santos further alleges that, after being moved from Cell B-209 on August 9, 2007 he was placed in Cell B-206, which he was told was used for inmates in administrative

segregation. (Id. ¶ 35.)  Santos was not in administrative segregation at the time, nor did he have

any charges pending against him. (Id. ¶ 36; Slipakoff Decl., Ex. D.) Further, at the time he was

moved to Cell B-206, Santos was directed to change into an orange jumpsuit, the color jumpsuit

of an inmate in administrative segregation. (Santos Decl. ¶ 37.)  Santos alleges he told the guard

that he was not supposed to be in administrative segregation and asked the guard to confirm the

same with his supervisor, which the guard promised to do. (Id. ¶ 38.) Nonetheless, for the rest of

the week, Santos claims he was treated as if he had been placed in administrative segregation,

and thereby denied privileges to which he was entitled such as commissary, phone usage, and

outside recreation time. (Id. ¶ 39.) During this time, Santos asserts he asked any guards he could

locate to speak with their supervisor to confirm this mistake; none did, and no supervisor ever

appeared. (Id.)

       Santos claims he was let out of his cell on August 16, 2007, but then immediately told to

return because he was supposedly in administrative segregation and could not participate in

commissary. (Id. ¶ 40.) At this time Santos informed the two guards on the cell block,

corrections officers Bradley and Brown, that he had been requesting a supervisor for the entire

week to come and speak with him about his unwarranted placement in administrative segregation,

and had been ignored that entire time. (Id.) Bradley allegedly ignored Santos's request and told

him to get back in his cell or he would "hit [Santos] with this hot s***," *i.e.*, pepper spray. (Id.)

After Santos again requested to speak with a supervisor, Brown allegedly grabbed Santos'

crutches out from under him, while Bradley took off Santos' glasses, threw them on the floor and

sprayed Santos in the face with pepper spray. (Id.)  Bradley also allegedly used his fingers to rub

the pepper spray in Santos' eyes. (Id.) Both guards then allegedly pushed Santos down the stairs

and then returned him to his cell, where he was shoved into his bunk.  (Id.) These actions

allegedly caused additional injury to Santos' already injured leg.  Santos also claims his eyeglasses were irreparably broken during this encounter, and he suffered nightmares for several weeks thereafter. (Id. ¶ 42-43.) Conversely, according to a disciplinary report filed by CO Bradley, Santos refused several orders to return to his cell, became violent, and raised his crutches as he moved toward CO Brown. (Def.'s Reply Supp. Mot. Summ. J., Ex. 3.) Thus, CO Bradley avers Santos was pepper sprayed because of these actions. (Id.)

### D.  Physical Assault by Another Inmate at the Direction of PDC Staff

As previously stated, on August 17, 2007 Santos was moved back to Cell B-209. (Id. ¶ 44.) Santos alleges that at this time, one of the guards (whom Santos believes to have been Brown) escorted another inmate housed on B-Block to Santos' cell. (Id. ¶ 45.) Brown allegedly removed the inmate's handcuffs, and the inmate approached Santos' cell and asked to speak with Santos. (Id.) Once Santos approached the door, the inmate allegedly punched Santos in the face through the window in the cell door. (Id.) After doing so, the inmate allegedly said "that's for my boy," which Santos understood to be a reference to either Brown (who brought the inmate to Santos' cell) or Bradley (who released the inmate from his cell). (Id.) After allegedly punching Santos in the face in view of Brown, the inmate was re-handcuffed by Brown and escorted off of B-Block by Bradley. (Id. ¶ 46.) Even though Santos notified a Sergeant Adams of the incident, he does not believe that this inmate was ever subjected to any disciplinary action. (Id. ¶ 47.) Delaney offers no response or counterstatement of facts regarding this alleged physical assault of Santos by another inmate at the direction of PDC staff.

### E.  Plaintiff's Grievances

During Santos' incarceration at the PDC, he submitted numerous written grievances and complaints to the PDC staff concerning the above-described conditions of confinement and alleged mistreatment at the hands of PDC guards. (Id. ¶¶ 4, 11; id. at Exs. A-P, T-W, Y, AA-BB.) The grievance procedure in the Philadelphia Prison System is not in dispute.  Pursuant to established procedure, a grievance is submitted by an inmate into a locked box on the cellblock. (Delaney Dep. 10:14-18; Christmas Dep. 48:8-9.)  The grievance is then picked up by the lieutenant or one of the officers assigned to the Deputy Warden of Administration, and brought to the Deputy Warden's office for review. (Delaney Dep. 10:24-11:1-2, 11:12-20.) Assuming the grievance did not contain offensive language or cover multiple topics, the grievance would be accepted and entered into the Lock & Track system for tracking and resolution. (Id. at 12:9-22; Christmas Dep. 38:17-22.) The Deputy Warden then assigns the grievance to the proper department for resolution. (Delaney Dep. 12:23-24-13:1-3.) Within 30 days, the department tasked with responding to the grievance reports its resolution to the Deputy Warden for review. (Id. at 13:7-12; Christmas Dep. 49:19-23.) The Deputy Warden then gives his or her own statement regarding the resolution of the grievance, and sends the resolution to the Warden for review. (Id. 49:21-23.) The Warden reviews the grievance resolution to ensure that the resolution is proper, and, if so, signs off on it. (Delaney Dep. 14:1-4.) Finally, the resolution is logged in the Lock & Track system, and the inmate is called into the Warden's office to discuss the resolution of his grievance and sign paperwork documenting the same. (Id. at 13:17-21.) If the inmate disagrees with the grievance resolution, he can appeal the decision to the Deputy Commissioner of the Philadelphia Prison System and, ultimately, the Commissioner. (Id. at 14:8-13.)

All grievances submitted according to this procedure and accepted by the PDC are to be resolved according to the PDC's grievance resolution procedures. (Christmas Dep. 47:12-16; Delaney Dep. 26:18-23; Powers Dep. 108:41-5, 134:10-16.) This is true not only for grievances submitted on official grievance forms, but also "grievable issues" identified on other forms (such as Requests to Staff). (Christmas Dep. 97:9-19; Delaney Dep. 21:8-21.)

Accordingly, Santos avers that each of the grievances and Requests to Staff attached to his Declaration (23 total) were submitted to the PDC staff through the procedure noted above. (Santos Decl. ¶ 5.) Santos maintains that none of these grievances or Requests to Staff raising grievable issues was returned to him for revision by PDC staff. (Id. ¶ 6); therefore, Santos argues, all of them were subject to the PDC's grievance resolution process.  Conversely, Delaney asserts that only one of Santos' grievances was filed in the Lock & Track system.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ P. 56(a); see also Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 501 (3d Cir. 2008).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. See Anderson, 477 U.S. at 248; Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its

burden of proof. See Celotex v. Catrett, 477 U.S. 317, 327 (1986).  Once the moving party has

carried its burden under Rule 56, "its' opponent must do more than simply show that there is

some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380

(2007).  Under Fed. R. Civ. P. 56(e), the opposing party must set forth specific facts showing a

genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. See

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007).

　　　At the summary judgment stage the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.

See Anderson, 477 U.S. at 249; Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d

Cir. 2007).  In doing so, the court must construe the facts and inferences in the light most

favorable to the non-moving party. See Horsehead Indus., Inc. v. Paramount Communications,

Inc., 258 F.3d 132 (3d Cir. 2001).  The court must award summary judgment on all claims unless

the non-moving party shows through affidavits or admissible evidence that an issue of material

fact remains. See, e.g., Love v. Rancocas Hosp., 270 F.Supp.2d 576, 579 (D.N.J. 2003); Koch

Materials Co. v. Shore Slurry Seal, Inc., 205 F.Supp.2d 324, 330 (D.N.J. 2002).

### III.  DISCUSSION

　　　Santos now brings the instant civil rights action pursuant to 42 U.S.C. § 1983.[3]  Santos

alleges violations of his constitutional rights under the Fourteenth Amendment.  Because Santos

---

[3] Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or
> Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity,
> or other proper proceeding for redress.

42 U.S.C. § 1983.  In order to bring a successful § 1983 claim, a plaintiff must demonstrate: (1) that the challenged
conduct was committed by a person acting under color of state law, and (2) that the conduct deprived the plaintiff of
a right, privilege, or immunity secured by the Constitution or federal law. See e.g., Piecknick v. Pennsylvania, 36

was a pretrial detainee while in the custody of Delaney, he technically has no rights under the Eighth Amendment. Hubbard v. Taylor, 399 F.3d 150, 164 (3d Cir. 2005) ("[T]he Eighth Amendment's Cruel and Unusual Punishments Clause does not apply until 'after sentence and conviction.'") (internal citation omitted).  Nevertheless, "[u]nder the Fourteenth Amendment, a pretrial detainee is entitled 'at a minimum, [to] no less protection' than a sentenced inmate is entitled to under the Eighth Amendment." Fuentes v. Wagner, 206 F.3d 335, 344 (3d Cir. 2000) (quoting Colburn v. Upper Darby Township, 838 F.2d 663, 668 (3d Cir.1988)) (second alternation in the original); see also Faulcon v. City of Philadelphia, 18 F. Supp. 2d 537, 540 (E.D. Pa. 1998), aff'd, 185 F.3d 861 (3d Cir. 1999) ("[C]ourts have determined that the rights afforded pretrial detainees under the due process clause are at least as great as those afforded by the Eighth Amendment.") (citing Simmons v. City of Philadelphia, 947 F.2d 1042, 1067 (3d Cir.1991). Accordingly, courts analyzing § 1983 cases brought by pretrial detainees apply the same standard of deliberate indifference as is applied is Eighth Amendment cases. Simmons, 947 F.2d at 1067.  The Court therefore applies the Eighth Amendment standards.

### A.  Exhaustion

As an initial matter, the Court must determine whether Santos has exhausted his claims through PDC's administrative process.  The Prison Litigation Reform Act ("PLRA") provides, in relevant part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  Accordingly, prior to filing a federal lawsuit, a plaintiff-inmate must exhaust his administrative remedies. "[C]ompliance with the administrative remedy scheme will

---

F.3d 1250, 1255–56 (3d Cir.1994). Here, it is undisputed that Delaney was acting under color of state law. Accordingly the only issue is whether Delaney violated Santos' constitutional rights.

be satisfactory if it is substantial." <u>Nyhuis v. Reno</u>, 204 F.3d 65, 77-78 (3d Cir.2000) (internal citations omitted).

Here, Delaney first argues that Santos' claims fail as a matter of law because Santos has failed to exhaust the administrative remedies available to him.  Delaney contends that Santos has not produced any evidence to demonstrate that he properly complied with the grievance procedure. According to Delaney, each of Santos' grievances clearly address multiple topics.  As previously stated, this is not permissible under the grievance procedure.  Delaney further argues that only one of Santos' grievances (concerning his medical condition) complied with the grievance procedure; this grievance, Delaney argues, was properly logged, processed, and resolved through the Lock & Track system. Moreover, Delaney argues that had Santos not agreed with the resolution of this particular grievance, he could have appealed but did not.

Considering the record before it, the Court finds that Santos has substantially complied with his available administrative remedies.  The Court first notes that Delaney did not assert failure to exhaust as an affirmative defense in his Answer to Santos' Second Amended Complaint.  Delaney's failure to plead this defense prevents him from belatedly raising this defense now. <u>See</u> <u>Ray v. Kertes</u>, 285 F.3d 287, 295 (3d Cir. 2002) ("We thus join the many other circuits that have held that failure to exhaust is an affirmative defense to be pleaded by the defendant."); <u>see</u> <u>also</u> <u>Jones v. Bock</u>, 549 U.S. 199, 216 (2007) ("[F]ailure to exhaust is an affirmative defense under the PLRA.").

Moreover, Delaney has presented no evidence suggesting that the PDC complied with its own obligations under the grievance procedure. Defendant Delaney and PDC's designee, Deputy Warden Patricia Powers, both testified that unless a grievance was returned to an inmate for revision, all grievances would be accepted and entered into the Lock and Track system. (Delaney

Dep. 26:18-23) (confirming that, "if a grievance was received, then it should have either been entered into Lock & Track or returned to the inmate"); (Powers Dep. 108:4-5) (explaining that, once a grievance is received and collected by the Deputy Warden of Administration, "[i]t's assigned a number in the [Lock &Track] system").  Santos has argued that none of the 23 grievances or Requests to Staff he submitted were returned to him for revision by the PDC. (Santos Decl. ¶¶ 6-7, 10.)  Conversely, Delaney has presented nothing which suggests these allegedly deficient grievances and Requests to Staff were, in fact, rejected and returned to Santos for revision.

Accordingly, the Court finds there is sufficient evidence that Santos followed and exhausted — to the extent he could without PDC staff action — the PDC's grievance resolution process. See Oliver v. Moore, 145 F. App'x 731, 735 (3d Cir.2005) ("An administrative remedy may be found to be unavailable where a prisoner is prevented by prison authorities from pursuing the prison grievance process.") (internal citation omitted); see also McClain, Jr. v. Alveriaz, CIV.A.07-5551, 2009 WL 3467836 (E.D. Pa. Oct. 26, 2009) ("Several other circuits have… expressly held that the exhaustion requirement is satisfied where prison officials fail to timely respond or to respond at all to an inmate's written grievance. In such cases, the grievance procedure is deemed 'unavailable' and the exhaustion requirement is excused.") (internal citations omitted).

### B.  Failure to Protect

"In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Hudson v. McMillian, 503 U.S. 1 (1992)).  Prison officials also have a duty to protect inmates from attacks by other inmates. Id.

at 833.  In addition, the Eighth Amendment imposes a duty on prison officials to "provide humane conditions of confinement"; as such, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Id. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526–527 (1984)).

In the instant matter, Santos' allegation that there was an excessive risk to his health and safety is based upon several incidents that occurred between approximately July 13, 2007 and August 18, 2007: (1) the use of force by corrections officers Bradley and Brown on August 16, 2007; (2) an attack by an unnamed inmate on August 17, 2007; and (3) an incident with an inoperable window in his cell.  To survive a summary judgment motion on a failure to protect claim, a plaintiff must show "sufficient evidence of (1) a substantial risk of serious harm; (2) the defendant's deliberate indifference to that risk; and (3) causation." Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir.1997) (internal citations omitted).  The Court will examine each of these elements in turn.

### 1.  Substantial Risk of Serious Harm

A prisoner must first demonstrate that "he is incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834.  This is an objective consideration, which "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. 25, 36 (1993) (emphasis in the original).  In particular, "[i]n determining whether the risk of an inmate being assaulted by other inmates is sufficiently serious to trigger constitutional protection

12

under the Eighth Amendment, the focus must be, not the extent of the physical injuries sustained in the attack, but rather the existence of a substantial risk of serious harm." Pearson v. Vaughn, 102 F. Supp. 2d 282, 290 (E.D. Pa. 2000) (internal quotations and citations omitted).

In this case, Santos has presented evidence upon which a factfinder could conclude that Santos was subjected to a substantial risk of serious harm.[4]  Specifically, Santos has presented evidence that PDC guards subjected him to potentially dangerous cell conditions, disregarded his medical needs, and ignored his repeated requests that these deprivations be remedied. (See Santos Decl. ¶¶ 12-34.) These complaints were documented in numerous contemporaneous grievances submitted to the PDC for Delaney's ultimate consideration. (Id. at Exs. A, B, C, D, E, F, G, H, J, L, M, T, U, W, Y (grievances regarding unmet medical needs); id. at Exs. A, B, C, D, E, G, H, I, J, W (grievances regarding poor cell conditions)).  Indeed, as Delaney concedes, the volume of grievances filed by Santos was unusually large considering Santos was only incarcerated at the PDC for a total of a few months. (Delaney Dep. 17:21-23.)  Further, Santos has presented evidence that within a short span of time, the neglect he allegedly suffered at the hands of PDC guards escalated to an assault by PDC staff and an assault by another inmate at the direction of PDC staff. (Santos Decl. ¶¶ 35-47.)  Although the facts of these alleged incidents are in dispute, at the summary judgment stage the Court must accept as true Santos' version of these incidents.

Thus, Santos has raised a genuine issue of material fact as to whether he faced a substantial risk of continuing and escalating harm at the hands of PDC guards.

---

[4] Delaney does not address this prong of a failure to protect claim.  Rather, Delaney only argues that Santos cannot establish the deliberate indifference prong.

### 2.  Deliberate Indifference

A showing that there was a substantial risk to Santos' safety is insufficient, standing alone, to preclude summary judgment.  A plaintiff must also show that the harm he suffered was caused by a defendant's deliberate indifference to his safety.  "'Deliberate indifference' describes a state of mind more blameworthy than negligence but less blameworthy than 'purpose or knowledge of causing harm.'" Talley v. Amarker, CIV.A. 95-7284, 1996 WL 660932 at *2 (E.D. Pa. Nov. 13, 1996) (quoting Farmer, 511 U.S. at 836).  Deliberate indifference can be shown when "a prison official knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.  Accordingly, to overcome a motion for summary judgment, a plaintiff must offer evidence that the official was "subjectively aware of the risk" of serious harm to the plaintiff, and disregarded that risk by failing to take reasonable measures to stop it. Id. at 829; see also Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (Because liability under § 1983 cannot be imposed vicariously or on the grounds of respondeat superior, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs.")

Here, Delaney contends Santos has produced no record evidence that (1) he had actual knowledge of these alleged incidents with other inmates and correctional officers; (2) that he (Delaney) had sufficient information from which to infer a substantial risk of serious harm to Santos; or (3) evidence that Delaney drew such an inference.  In particular, Delaney asserts there is no evidence, or claim by Santos, that corrections officers Bradley or Brown had used any force against Santos prior to the incident on August 16, 2007.  It is Delaney's position that, without some prior incident which would alert Delaney of any potential threat of harm to Santos,

14

Delaney would not have any reason to know that any corrections officers posed a threat or risk of harm to Santos.  Delaney claims the same is also true of the alleged attack by the other inmate: nothing in the record indicates that there were any prior incidents which would have put the prison officials on notice.  With respect to the allegedly inoperable window, Delaney asserts there is no evidence that the guards caused its allegedly defective condition.  Delaney further argues that, because Santos was transferred to another cell the next day and the alleged defect was ultimately cured, Santos cannot establish that the incident warranted Delaney's attention.  Thus, Delaney maintains that Santos cannot sustain his burden of demonstrating through evidence that Delaney knew of the risks to Santos and deliberately disregarded that fact.

The Court disagrees. Delaney correctly notes that there has been no evidence, or claim by Santos, that Delaney was physically present during any of the incidents in question.  However, Delaney's other arguments only serve to obscure what the relevant issue is.  Delaney need not have been directly involved in these incidents in order to have knowledge of them.  It is evident that Santos filed numerous grievances and Requests to Staff concerning his alleged mistreatment. (See Santos Decl., ¶¶ 4-5; id. at Exs. C, G, H, J, K, L, O, T, U, W, AA, and BB (Inmate Grievance Forms) and Exs. A, B, D, E, F, I, M, N, P, V, and Y (Requests to Staff)).  Three PDC staff members, including Delaney himself, have consistently testified that all medical or general grievances that were not returned to the inmate for revision would have been logged, resolved, and ultimately reviewed by Delaney. (See Christmas Dep. 47:12-16; Delaney Dep. 26:18-23; Powers Dep. 108:41-5, 134:10-16.)  Delaney further confirmed that part of his duties was to "review [grievance resolutions] to ensure that the resolution was the proper resolution[.]" (Delaney Dep. 13:22-14:4, 19:8-12) (admitting that, if an inmate filed a medical grievance, "[a]fter it was resolved I would sign off on it"); (see also Powers Dep. 110:17-19) (conceding

that "in all cases the warden will see a grievance").  The only record evidence is that none of

Santos' grievances were returned to him. (Santos Decl. ¶ 6.)  Thus, based on prison policy, the

admissions of senior PDC staff, and the admissions of Delaney himself, Delaney should have

seen and reviewed at least 12, and as many as 23, grievances and/or Requests to Staff from

Santos.  Consequently, Delaney *should* have had knowledge of Santos' grievances.  However,

Delaney has presented no evidence that anything was done to prevent further mistreatment from

occurring.

 A reasonable jury could find that Delaney's deliberate indifference to the risk of

substantial harm is evidenced by the numerous grievances Santos submitted, which Delaney

admits he would have seen, but upon which Delaney failed to act. See Talley, 1996 WL 660932

at *8-9 (denying defendant warden's motion for summary judgment where plaintiff-inmate

presented evidence that he filed numerous grievances indicating his concerns regarding a

medically improper diet, which the prison official reviewed but did not act upon); see also

Hamilton v. Leavy, 117 F.3d 742, 747 (3d Cir. 1997) ("A prison official's knowledge of a

substantial risk is a question of fact and can, of course, be proved by circumstantial evidence.")

(citing Farmer, 511 U.S. at 839); Young v. Quinlan, 960 F.2d 351, 360 n. 21 (3d Cir. 1992)

("When state of mind is an essential element of the nonmoving party's claim, resolution of the

claim by summary judgment is often inappropriate because a party's state of mind is inherently a

question of fact which turns on credibility.") (internal citations omitted).  Santos has therefore

raised a genuine issue of material fact as to whether Delaney was deliberately indifferent.

 **3.  Causation**

 The Court further finds that Santos has presented sufficient evidence that Delaney's

deliberate indifference caused Santos serious harm.  If Delaney failed to take action on Santos'

grievances, there is a genuine issue of material fact as whether this failure to intervene caused Santos further harm.

Based on the foregoing, granting summary judgment on Santos' failure to protect claim is inappropriate.

## C.  Inadequate Medical Care

To succeed on an Eighth Amendment inadequate medical care claim, a plaintiff must demonstrate that (1) he suffered from serious medical needs and (2) the defendant acted or failed to act in a manner exhibiting deliberate indifference to those medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir.1999).  The Court again examines each of these elements in turn.

### 1.  Serious Medical Need

A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Pace v. Fauver, 479 F.Supp. 456, 458 (D.N.J.1979), aff'd, 649 F.2d 860 (3d Cir.1981). As the Third Circuit held in Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro,

> [t]he seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment. For instance, Estelle makes clear that if "unnecessary and wanton infliction of pain," 429 U.S. at 103, 97 S.Ct. at 290, results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the [E]ighth [A]mendment. See id. at 105, 97 S.Ct. at 291. In addition, where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious.

834 F.2d 326, 347 (3d Cir. 1987).

The serious medical need at issue here is the leg injury Santos sustained after falling from his bunk bed on July 13, 2007.  With respect to this incident, Delaney argues that Santos has not produced any evidence that the injury he sustained constitutes a "serious medical need."

The Court agrees that it is not entirely clear from the record just how severe Santos' leg injury was.  Moreover, given the amount of time that has elapsed since Santos' injury, it is also unclear what lasting effects, if any, Santos continues to suffer.[5]  Nonetheless, the record demonstrates that Santos' injury was at least serious enough to warrant two trips to a hospital and repeated grievances filed by Santos.  Additionally, the single grievance that was filed in the Lock & Track system concerned Santos' injury.  According to the report in the Lock & Track system, Santos was "seen daily by medical doctors" regarding his complaints. (Def.'s Reply Supp. Mot. Summ. J., Exs. 4, 4a, 4b.)  Santos also claims he continues to feel pain and swelling in his leg to this day. (Santos Decl. ¶ 22.)

The Court finds that based on the foregoing, a reasonable jury could find Santos' injury satisfies the seriousness prong.

### 2.   Deliberate Indifference

Deliberate indifference to a serious medical need has been found where the prison official "(1) knew of a prisoner's need for medical treatment and intentionally refused to provide it; (2) delayed necessary medical treatment for a non-medical reason; or (3) prevented a prisoner from receiving needed or recommended medical treatment.  Gayle v. Lamont, CIV.A. 09-1290, 2013 WL 102660 (E.D. Pa. Jan. 9, 2013) (citing Rouse, 182 F.3d at 197).  The prison official must actually know of and disregard "an excessive risk to inmate health and safety." Farmer, 511 U.S. at 837. Circumstantial evidence can demonstrate subjective knowledge if it shows that the

---

[5] Santos, then pro se, filed this action on July 30, 2009.  Subsequently, on October 9, 2009, this Court ordered that Santos be appointed counsel through the Eastern District of Pennsylvania's Prisoner Civil Rights Panel.  A significant delay in this case thereafter ensued, as Santos was not able to obtain counsel through the Prisoner Civil Rights Panel until April 20, 2012.  Since then, Santos has been convicted and relocated to several different prisons, which has made communication with his attorney difficult.

excessive risk was so obvious the official must have known about it.  Beers–Capitol v. Whetzel,
256 F.3d 120, 133 (3d Cir.2001) (citing Farmer, 511 U.S. at 842).

Delaney argues that the record indicates that Santos was taken to Frankford Hospital the
day he injured his leg, and was again taken back to the hospital after he experienced continued
pain.  Delaney also notes that one of Santos' grievances acknowledges that Santos was visited by
Dr. James Perry, a medical professional at PDC, on July 22, 2007.  Finally, Delaney notes that
the grievance logged into the Lock & Track system further confirms that Santos was seen by
PDC medical staff.  It is therefore Delaney's position that Santos was not denied medical
treatment.

The Court again disagrees.  As previously discussed with respect to Santos' failure to
protect claim, the undisputed grievance process is that Delaney would have reviewed all of
Santos grievances to ensure they were properly resolved.  Thus, Delaney presumably should
have seen every one of the 12 Inmate Grievance forms and 11 Requests to Staff forms submitted
by Santos during his time at the PDC.  Nonetheless, Delaney is able to point to only one report in
the Lock & Track system which addresses Santos' concerns.  This report is marked as having
been submitted on July 27, 2007, logged on August 1, 2007, and "resolved" on August 22, 2007.
However, a review of Santos' grievances indicates that between July 14, 2007 (the day after his
injury) and August 22, 2007 (the day Santos' grievance was "resolved"), Santos complained
about his medical needs eight times.[6]  Notably, Santos' complaints continued even after he was

---

[6] See Santos Decl., Ex. B (dated 7/14/07) (noting that he was denied ice for his prescribed ice bath, and denied
"meds for swelling . . [and] pain med also"); Ex. L (7/15/07) (requesting MRI or CAT scan for right leg or knee); Ex.
Q (7/16/07) (describing injuries and requesting examination of leg, lower back and shoulder); Ex. T (7/25/07)
(noting that he would hunger strike because he had not received the pulmonary stocking for his leg, had yet to have
"anyone treat me for my back [i]njury from 7-13-07," despite suffering "[m]uch pain and muscle spasms," and did
not get an ultrasound of his ankle); Ex. U (7/25/07) (noting that his "sick call slips go unanswered," and stating that
the "pain in my lower (R) back is unbearable," "injury to my back has been neglected since 7-13-07," and "sharp
pain run up cord in my spine, need checked");  Ex. C (7/25/07) (stating that his hunger strike would continue "until
proper medical care is provided . . . [u]ntil basic sick calls are answered…[u]ntil I get treatment for my back"); Ex.

seen by Dr. Perry on July 22, 2007.  Delaney offers no explanation for the apparent delays in Santos receiving medical attention, including the sock or leg wrap he was prescribed by PDC medical staff.

Accordingly, because disputed issues of fact again exist regarding Delaney's deliberate indifference to Santos's medical needs, Delaney's Motion for Summary Judgment must also be denied on this claim.

## IV.     <u>CONCLUSION</u>

For the reasons set forth above, Defendant's Motion for Summary Judgment is denied in its entirety.  An appropriate order follows.

---

E (7/26/07) (noting a "13 day run without proper medical treatment"); Ex. G (8/9); Ex. W (8/14) (noting that his injuries were still not resolved); Ex. Y (8/16/07) (stating that "all of my human rights to adequate care (health) and (medical) are being trampled under foot [sic] as meaningless").